Guillermo S. VELA and wife, Belinda Vela, Appellants,

v.

EBERT'S MOBILE HOMES, INC., Appellee.

No. 1825.

Court of Appeals of Texas, Corpus Christi.

Feb. 25, 1982.

Rehearing Denied April 8, 1982.

Andrew Cline, Bayne, Snell & Krause, San Antonio, for appellants.

Robert L. Ramey, Corpus Christi, for appellee.

Before NYE, C. J., and YOUNG and GONZALEZ, JJ.

## OPINION

NYE, Chief Justice.

This is a consumer credit case. Appellants [hereinafter called the Velas] filed this suit against appellee [hereinafter Ebert's] to recover statutory penalties under Chapter 6 of the Texas Consumer Credit Code, Tex.Rev.Civ.Stat.Ann. arts. 5069–6.01 et seq. (Vernon 1971), and the Texas Deceptive Trade Practices Act, Tex.Bus. & Comm. Code Ann. §§ 17.01 et seq. (Vernon Supp. 1980–1981). Ebert's filed a counterclaim alleging that the Velas interfered with its contractual relationships and engaged in a civil conspiracy in so doing.

Sometime in 1974, the Velas were desirous of purchasing a mobile home. They visited Ebert's sales lot where a salesman showed them what Ebert's had available. The Velas found a used fifty by twelve foot, 1971 mobile home they wished to purchase. The cash price was $3,842.80, but the Velas could only afford a down payment of $150.00 and monthly payments of $75.00.

Ebert's salesman completed a "Purchase Agreement" which set out the cash price, a down payment of $307.05, an insurance premium of $384.00, license and title fees of $80.25, an amount to be financed of $4,000.00, and a finance charge of $2,379.80. The total deferred payment price was

$6,686.85, to be paid in eighty-four monthly installments of $75.95 each. The instrument was dated October 10, 1974 and bears the undisputed signatures of the Velas and the typewritten name of Ebert's.

Richard Ebert testified that he was unable to locate a lending institution willing to finance the Velas' purchase of the mobile home. To accommodate the Velas, Ebert's entered into a "Mobile Home Lease With An Option To Purchase" agreement. This instrument, also dated October 10, 1974, has what purports to be the signatures of the Velas; however, they denied that they ever signed it. This "lease" provides for a $307.05 earnest money payment and a rental of $6,379.80, payable in eighty-four monthly installments of $75.95 each. At the end of the eighty-four month term, Ebert's was bound to accept the total rent paid ($6,379.80) plus the earnest money ($307.05) in exchange for the title to the mobile home. No additional payment from the Velas was required.

The Velas took delivery of the mobile home and made payments to Ebert's on a fairly regular basis for three years. The Velas alleged that they had numerous problems with the mobile home which were not properly corrected by Ebert's until a few months prior to the repossession of the trailer. These allegations were disputed by Ebert's. In May of 1977, the Velas, without the knowledge of Ebert's, moved the mobile home away from its original location onto land owned by Mrs. Vela's father. The Velas then moved out of the mobile home and into a house that they had purchased. They in turn rented the trailer through the local Housing Authority and received seventy to seventy-five dollars per month from the Housing Authority and twenty dollars per month from the tenant occupying the mobile home. Payments to Ebert's ceased. After four payments went unpaid, Ebert's located the mobile home and repossessed it.

The Velas filed suit against Ebert's, alleging five violations of the Texas Consumer Credit Code and three violations of the Texas Deceptive Trade Practices Act. Included in their allegations of violations of the Consumer Credit Code was the failure of Ebert's to provide to the Velas the notice required by Tex.Rev.Civ.Stat.Ann. art. 5069–6.02(2) (Vernon 1971). The alleged Deceptive Trade Practices Act violations were:

(A) representing the mobile home was of a particular standard or quality when in fact it was of a lesser standard or quality;

(B) breach of express warranties; and

(C) engaging in unconscionable actions in the repossession of the mobile home.

Ebert's filed a counterclaim alleging, among other things, that following the repossession, the Velas engaged in a willful and malicious conspiracy to cause financial deprivation and hardship to the Eberts.

The trial court submitted twenty special issues to the jury. In response to the special issues concerning the Velas' claims, the jury found relevant to this appeal that:

(1) Ebert's failed to include the statutory "Notice to the Buyer" in the contract;

(5) Ebert's did *not* commit a breach of the peace in the repossession of the mobile home;

(6) the Velas bought the mobile home primarily for personal, family, or household use;

(7) Ebert's did *not* misrepresent the quality of the mobile home;

(10) reasonable attorney's fees for the Velas were $2,760.00; and

(11) Ebert's did *not* engage in an unconscionable action in repossessing the mobile home.

The trial court instructed the jury that if they had answered either special issue 7 or 11 "we do," then they should not answer special issues 13, 14, 15 or 16.

In response to the special issues requested by Ebert's, the jury found (following the trial court's instructions) that:

(13, 14 & 15) the Velas' claim under the Deceptive Trade Practices Act was [13] groundless; [14] brought in bad faith; and [15] for harassment purposes;

(16) reasonable attorney's fees for defending the Velas' Deceptive Trade Practices Act claim were $3,500.00;

(17) the Velas interfered with the contract rights of Ebert's "in the transaction in question,"

(18) the Velas engaged in a conspiracy to interfere with Eberts' contract rights "relating to the 1971 New Moon Mobile home."

(19) Ebert's suffered $75.00 actual damages in the repossession of the mobile home; and

(20) the sum of $500.00 should be awarded Ebert's as exemplary damages.

The trial court disregarded the jury's finding that the contract in question failed to provide the required "Notice to the Buyer" and rendered a take nothing judgment against the Velas. Judgment was entered awarding Ebert's $75.00 actual damages, $500.00 exemplary damages, and $3,500.00 as attorney's fees for defending the Velas' Deceptive Trade Practices Act claim. The Velas have appealed claiming three points of error.

In their first point of error, the Velas contend the trial court erred in not entering judgment in accordance with the jury's finding that Ebert's failed to include the required "Notice to the Buyer" in the contract. Ebert's, on the other hand, contends that the trial court acted correctly because the Statute upon which the Velas based their claim applied only to "goods" and the Velas, over the objection of Ebert's, refused to submit an issue inquiring whether the mobile home in question fell within the statutory definition of "goods."

The term "goods" is defined in chapter 6 of the Texas Consumer Credit Code as:

"(a) 'Goods' means all tangible personal property when purchased primarily for personal, family or household use and not for commercial or business use, including such which is furnished or used at the time of sale or subsequently, in the modernization, rehabilitation, repair, alteration, improvement or construction of real property so as to become a part thereof whether or not severable therefrom. The term also includes, but is not limited to, any boat, boat-trailer, motor scooter, motorcycle, camper-type trailer, horse trailer, any vehicle propelled or drawn exclusively by muscular power, and merchandise certificates or coupons, issued by a retail seller, not redeemable in cash and to be used in their face amount in lieu of cash, in exchange for goods or services sold by such seller.

The term does not include ... (ii) any automobile, mobile home, truck, trailer, semi-trailer truck tractor or bus designed and *used primarily to transport persons or property on a public highway;* ....

Tex.Rev.Civ.Stat.Ann. art. 5069–6.01(a) (Vernon 1971) (emphasis supplied)

Ebert's contends that because Richard Ebert testified that the mobile home in question was designed to carry persons or property on a highway, and was moved several times, a fact issue was created as to whether it falls within the motor vehicle exclusion found in the second paragraph of the definition. We disagree.

The mobile home in question is a fifty foot by twelve foot trailer with two bedrooms and one bathroom. The jury found that the Velas purchased it primarily for personal, family, or household use. After it was purchased, it remained tied down to the same location for three years before being moved by the Velas; it remained tied down at the second location for approximately four months. There is no evidence in the record to support Ebert's contention that the mobile home was designed and *used primarily* to transport persons or property on a public highway. See *Yates v. Mobile America Sales Corp.*, 591 S.W.2d 453 (Tex.1980).

Since the mobile home fails to meet the definition of motor vehicle, as set out in art. 5069–7.01(a), we hold, as a matter of law, that the Velas' mobile home was "goods," and its credit sale was regulated by Chapter 6 of the Consumer Credit Code. See *Mobile America Sales Corp. v. Gradley*, 612 S.W.2d 625 (Tex.Civ.App.—Beaumont 1980, no writ).

Having determined that the mobile home in question falls within Chapter 6 of the Consumer Credit Code, the next issue is whether the Velas are entitled to recover statutory penalties. To be entitled to such a recovery, art. 5069–8.01 requires that the purchaser (Velas) establish that the seller (Ebert's) failed to perform a duty specifically imposed on it by one of the provisions of the Texas Consumer Credit Code.

Article 5069–6.02(2) requires each "Retail Installment Contract" to contain a notice to the buyer, printed or typed in at least ten point bold type, in substantially the language set out in the Statute.[1] The jury found that the contract used by Ebert's did not contain any such notice.

Ebert's attempts to take this contract out of the purview of the Consumer Credit Code by contending that Ebert's never intended the transaction to be a retail installment contract. Ebert's contends that the "Mobile Home Lease With An Option To Purchase" embodied the entire contractual relationship between the parties.

The terms of this so-called "lease" were substantially the same as the Sales Agreement. The Consumer Credit Code's definition of "Retail Installment Contract" provides, in pertinent part:

"The term 'retail installment contract' may include . . . a contract in the form of a bailment or a lease if the bailee or lessee contracts to pay as compensation for their use a sum substantially equivalent to or in excess of the value of the goods sold and if it is agreed that the bailee or lessee is bound to become, or for no other or a merely nominal consideration, has the option of becoming the owner of the goods upon full compliance with the provisions of the bailment or lease. Tex.Rev.Civ.Stat.Ann. art. 5069–6.01(f) (Vernon 1971)."

■ The "Mobile Home Lease With An Option To Purchase" in the case at bar required a rental of $6,379.80 for a mobile home with a cash price of $3,842.80. The rental payments were identical to the installment payments shown on the "Sales Agreement," and at the end of the eighty-four month term, the Velas had the option of becoming the owner of the mobile home for no additional consideration. We hold that the contract between the Velas and Ebert's was a retail installment contract as a matter of law. *See Tom Benson Chevway Rental & Leasing v. Allen,* 571 S.W.2d 346 (Tex.Civ.App.—El Paso 1978, writ ref'd n.r. e.), cert. denied 442 U.S. 930, 99 S.Ct. 2861, 61 L.Ed.2d 298 (1979).

Since the retail installment contract did not contain the notice required by art. 5069–6.02(2), the Velas are entitled to recover the penalty provided in art. 5069–8.01. That article provides for a penalty of twice the time price differential and reasonable attorney's fees. The time price differential in this case amounts to $2,379.80. The Velas are therefore entitled to recover from Ebert's $4,759.60, plus the attorney's fees found by the jury in the amount of $2,760.00.

■ In their second point of error, the Velas contend the trial court erred in submitting special issues inquiring whether their claim under the Deceptive Trade Practices Act was groundless, brought in bad faith, and for the purposes of harassment only. We disagree. Section 17.50(c) of the Deceptive Trade Practices-Consumer Protection Act, at the time this action commenced, gave the trial court discretion to award the defendant attorney's fees if the court found that the action was groundless and brought in bad faith for the purposes of harassment. Tex.Bus. & Comm.Code § 17.-50(c) (Vernon Supp. 1980–1981). In determining whether to exercise that discretion,

---

1. The required notice is as follows:

"NOTICE TO THE BUYER. DO NOT SIGN THIS CONTRACT BEFORE YOU READ IT OR IF IT CONTAINS BLANK SPACES. YOU ARE ENTITLED TO HAVE A COPY OF THE CONTRACT YOU SIGN. UNDER THE LAW YOU HAVE THE RIGHT TO PAY OFF IN AD-VANCE THE FULL AMOUNT DUE AND UNDER CERTAIN CONDITIONS MAY OBTAIN A PARTIAL REFUND OF THE TIME PRICE DIFFERENTIAL. KEEP THIS CONTRACT TO PROTECT YOUR LEGAL RIGHTS." Tex.Rev. Civ.Stat.Ann.art. 5069–6.02(2) (Vernon 1971).

the court may submit questions to the jury on these issues. *Brunstetter v. Southern,* 619 S.W.2d 557, 561 (Tex.Civ.App.—San Antonio 1981, no writ); *Bray v. Curtis,* 544 S.W.2d 816, 820 (Tex.Civ.App.—Corpus Christi 1976, writ ref'd n. r. e.). *Contra O'Shea v. Int'l. Business Mach. Corp.,* 578 S.W.2d 844 (Tex.Civ.App.—Houston [1st Dist.] 1979, n. r. e.). The finding of the jury would be advisory only. If it was error to submit these issues, it was harmless error. The Velas' second point of error is overruled.

■ Appellant's third point of error is that "the trial court erred in submitting to the jury special issue numbers seventeen, eighteen, nineteen and twenty because there was no legally and factually sufficient evidence to support the submission of these issues." The jury found (17) that the Velas had interfered with the contractual rights of Ebert's Mobile Homes, Inc., in the transaction in question; (18) that there was a conspiracy between the Velas to interfere with Ebert's contract rights relating to the mobile home; (19) that seventy-five dollars would reasonably compensate Ebert's for damage proximately caused by the Velas, and (20) that exemplary damages should be awarded to Ebert's in the amount of $500.00.

Generally, a trial court must submit a requested special issue if there is any evidence to support it. This is true even though an affirmative answer might be against the great weight and preponderance of the evidence. *Burns v. Union Standard Ins. Co.,* 580 S.W.2d 650, 653 (Tex.Civ.App.—Fort Worth 1979), affirmed, 593 S.W.2d 309 (Tex.1980).

To support the submission of any of the four enumerated special issues complained of by the appellant Velas, there must have been more than a mere scintilla of evidence when viewing the evidence most favorable to the submission of the issue, disregarding all contradictory evidence. *In re King's Estate,* 150 Tex. 662, 244 S.W.2d 660 (1951). We have carefully reviewed the entire record and find that there was evidence. Appellant's point of error number three is overruled.

The judgment of the trial court concerning the Velas' cause of action concerning the Credit Code violation is reversed and judgment is here rendered awarding the Velas $4,759.60, plus attorney fees in the amount of $2,760.00, for a total of $7,519.60.

That portion of the judgment of the trial court awarding Ebert's $75.00 actual damages, $500.00 exemplary damages and $3,500.00 attorney fees, for a total of $4,075.00, by virtue of Ebert's cross-action, is hereby affirmed.

Ebert's portion of the judgment in the amount of $4,075.00, shall be an offset against the Velas' judgment in the amount of $7,519.60, leaving a difference owed by Ebert's to the Velas in the amount of $3,444.60. This amount shall bear interest at the statutory rate from the date of judgment until paid. Costs shall be divided 60% to the Ebert's and 40% to the Velas. All of the rest of the court's judgment is affirmed.

Judgment of the trial court is reversed and rendered in part and affirmed in part.